**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHARLES TALBERT** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 23-2255** |
| | : | |
| **DEPARTMENT OF CORRECTIONS,** | : | |
| **MR. COOPER, MR. GARMAN, MR.** | : | |
| **GREEN, MR. PISTON, MS. JORDAN,** | : | |
| **MR. NESMITH, MR. BRUCE, MR.** | : | |
| **CASEY, MR. BEESLEY** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                                                    **July 31, 2022**

The incarcerated Charles Talbert repeatedly sues state actors challenging his conditions of custody as he moves among different prisons addressing state court charges in different counties. He states a claim sometimes; most times he does not.  He then later alleges state actors retaliate against him because he earlier sued other state actors. We today meet our Congressionally mandated obligation in screening a far-ranging series of allegations against several persons at two prisons claiming correctional officers and supervisors violated, and conspired to violate, his First, Eighth, and Fourteenth Amendment rights, the Department of Corrections violated his rights under the Americans with Disabilities Act, and some correctional officers are liable for assault and battery. Mr. Talbert may proceed on his Eighth Amendment excessive force claim against those allegedly directly involved in specifically plead conduct. He may also proceed on his Fourteenth Amendment claim and state law assault and battery claims against two officers alleged to have sprayed him with oleoresin capsicum spray. He may also proceed against the Department of Corrections on his disabilities discrimination claims based on his respiratory and circulatory disabilities. Mr. Talbert may now timely serve the remaining parties. We can test his surviving allegations. We dismiss his remaining claims without prejudice.

## I.   Alleged *pro se* facts

The incarcerated Charles Talbert presents asthma and hypertension conditions while moving around several of the Commonwealth's correctional facilities managed by the Pennsylvania Department of Corrections.[1] His most recent health-based claims arise from an unidentified individual diagnosing Mr. Talbert with respiratory and circulatory system disabilities including asthma and hypertension between March and June 2023.[2] A unnamed medical provider prescribed Mr. Talbert an inhaler for his asthma and Losartan for his hypertension after his diagnoses.[3] Mr. Talbert's high blood pressure has increased because of stressful conditions while incarcerated.[4] He also regularly sues state actors including correctional officers leading us to bar his continued filings without paying the docket fees unless he faces imminent harm of danger.[5]

Department of Corrections employees—including those he sues—knew of Mr. Talbert's medical conditions and history of lawsuits, prison grievances, and complaints against other staff.[6]

### *Correctional officers spray Mr. Talbert with oleoresin capsicum.*

The Department of Corrections detained Mr. Talbert at SCI Coal Township some time before March 31, 2023.[7] Mr. Talbert covered his cell door window with unknown materials for unknown reasons on March 31, 2023.[8] SCI Coal Township Correctional Officer Casey "maliciously, sadistically, and with reckless indifference to [Mr. Talbert's] asthma" sprayed oleoresin capsicum through the covered vent.[9] Mr. Talbert asphyxiated and suffered "other respiratory system complications" from the oleoresin capsicum spray.[10] Unnamed correctional officers eventually moved Mr. Talbert from his "small contaminated cell" to the infirmary where he remained for one day under medical observation.[11]

Mr. Talbert returned to his "contaminated cell" the next day.[12] He cleaned his cell to "decontaminate his living area", washed his clothes, and begun to hang them up to dry when Correctional Officer Beesley approached him.[13] Correctional Officer Beesley "harass[ed]" Mr.

Talbert with unpleaded derogatory, verbal remarks and banged the cell door with a metal object.[14] Correctional Officer Beesley walked away from the cell door and then returned to "maliciously, sadistically, and in reckless indifference to [Mr. Talbert's] asthma" spray him through the vent with oleoresin capsicum spray.[15] Mr. Talbert again asphyxiated and suffered other respiratory complications from the oleoresin capsicum spray.[16] Unnamed correctional officers later moved Mr. Talbert from his cell to the infirmary for an unidentified period of time.[17]

### Mr. Talbert claims a "campaign of retaliation" after transfer to SCI Phoenix.

The Department of Corrections transferred Mr. Talbert from SCI Coal Township to SCI Phoenix because of "open criminal matters" on April 18, 2023.[18] Mr. Talbert filed an abuse complaint through the Department of Corrections concerning the oleoresin capsicum spray incident with Correctional Officer Beesley at some unknown time between April 1, 2023 and April 28, 2023.[19] Mr. Talbert interviewed with an unnamed Department of Corrections' security officer about Correctional Officer Beesley's conduct stemming from his complaint on April 28, 2023.[20] Mr. Talbert claims SCI Phoenix supervisors and employees then "began a campaign of retaliation" because of his complaint against Correctional Officer Beesley and a recent settlement against former SCI Phoenix employee Dennis A. Brown.[21] This "campaign of retaliation" involved correctional officers discontinuing Mr. Talbert's medical diet, calling Mr. Talbert a "snitch," withholding his mail, depriving him of his dinner, and denying him prison grievances over the span of two months.[22]

### Correctional officers discontinue Mr. Talbert's medical diet.

Dr. Pinky Bora Saikia prescribed Mr. Talbert a "medical therapeutic diet" on April 27, 2023.[23] The diet required Mr. Talbert be given two trays each meal with a peanut butter and jelly sandwich as a "therapeutic snack" accommodating his gastrointestinal tract disability.[24] Dietician

Cooper discontinued Mr. Talbert's medical diet on May 5, 2023 at SCI Phoenix "in retaliation" for Mr. Talbert suing the Department of Corrections, Secretary George Little, and former Dietician Anne Brown.[25] Mr. Talbert suffered hunger pains, starvation, dehydration, fatigue, malabsorption of vitamins, malnutrition, and diarrhea from the discontinued medical diet.[26]

### Correctional officers call Mr. Talbert a "snitch."

SCI Phoenix Sergeants Green and Piston and SCI Phoenix Correctional Officers Jordan, Nesmith, and Bruce "routinely" called Mr. Talbert a "snitch" in front of other incarcerated individuals "in an attempt to cause hostility and get him injured" between May and June 2023.[27] Mr. Talbert informed SCI Phoenix Unit Manager Smith, Counselor Watkins, and Lieutenants McCain and Garman of the Correctional Officers' behavior on May 25, 2023 and May 26, 2023.[28] But they all turned a "blind eye[.]"[29] Unit Manager Smith, Counselor Watkins, and Lieutenants McCain and Garman did not investigate Mr. Talbert's allegations.[30]

### Correctional officers withhold Mr. Talbert's mail.

Mr. Talbert subscribed to publications and received mail while incarcerated at SCI Phoenix.[31] Correctional Officers Jordan, Nesmith, and Bruce "routinely depriv[ed]" Mr. Talbert of his incoming communications between May and June 2023 because of his "litigious behavior."[32] Mr. Talbert informed Unit Manager Smith, Counselor Watkins, and Mail Inspector Supervisor Long of the Correctional Officers' actions but they did not investigate his claim.[33]

### Correctional officers deprive Mr. Talbert of his dinner.

Sergeants Green and Piston and Lieutenant Garman helped Correctional Officers Jordan, Nesmith, and Bruce in depriving Mr. Talbert of his dinner sometime between May 25, 2023 and June 2023.[34] Mr. Talbert told Unit Manager Smith, Counselor Watkins, and Lieutenant McCain how they denied him dinner.[35] But they "refused to" investigate the claim.[36]

*Correctional officers deny Mr. Talbert grievance forms.*

Mr. Talbert at unidentified times "repeatedly" asked unnamed individuals for prison grievance forms so "he could exhaust his administrative remedies[.]"[37] But SCI Phoenix employees and "their co-workers" denied Mr. Talbert the forms.[38]

## II.   Analysis

Mr. Talbert pro se sues the Department of Corrections; Secretary Little; Dietician Cooper; Unit Manager Smith; Counselor Watkins; Mail Inspector Supervisor Long; Lieutenants Garman and McCain; Sergeants Green and Piston; and Correctional Officers Nesmith, Jordan, Bruce, Casey, and Beesley in their individual and official capacities.[39] Mr. Talbert's *pro se* Complaint, construed in the most liberal fashion without speculation, seemingly tries to plead claims against these entities and individuals for: violating the First, Eighth, and Fourteenth Amendments; violating the Americans with Disabilities Act; battery and assault under Pennsylvania Law; and civil conspiracy. Mr. Talbert claims the Department of Corrections and its employees targeted him and violated his civil rights because of his "litigious behavior[.]"[40] And Mr. Talbert alleges the Department of Corrections, through its Secretary George Little, did not properly train its employees or create policies providing appropriate measures for individuals with respiratory, digestive, and/or circulatory disabilities, which caused Mr. Talbert to suffer adverse health conditions.[41] Mr. Talbert claims he suffered physical harm, mental anguish, increased blood pressure, and stress because of the civil rights violations against him.[42] He seeks monetary damages, punitive damages, injunctive relief, and legal fees.[43]

We must screen Mr. Talbert's allegations for merit before issuing summons as Mr. Talbert knows from his earlier cases. Congress requires us to screen Mr. Talbert's Complaint under 28 U.S.C. § 1915A.[44] We must "review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a

governmental entity or officer or employee of a governmental entity."[45] We must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted."[46]

We apply the same standard used under Federal Rule of Civil Procedure 12(b)(6) when considering whether to dismiss a complaint for failure to state a claim under section 1915A(b)(1).[47] A complaint containing "sufficient factual matter, accepted as true, to state a claim that is plausible on its face" satisfies the standard under Rule 12(b)(6).[48] We accept all factual allegations in Mr. Talbert's Complaint as true and must construe those facts in the light most favorable to him when determining whether he states a claim to relief plausible on its face.[49]

We are directed by our Court of Appeals to be "mindful of our obligation to liberally construe a *pro se* litigant's pleadings particularly where the *pro se* litigant is imprisoned."[50] We are to "remain flexible" and "apply the relevant legal principle even when the complaint has failed to name it."[51] But "*pro se* litigants still must allege sufficient facts in their complaints to support a claim" and "cannot flout procedural rules – they must abide by the same rules that apply to all other litigants."[52]

We review Mr. Talbert's First, Eighth, and Fourteenth Amendment claims mindful Congress, under 42 U.S.C. § 1983, allows persons to seek relief for constitutional claims in federal court.[53] "To state a claim under [section] 1983, [Mr. Talbert] must allege the violation of a right secured by the Constitution and laws of the United States and must show [ ] the alleged deprivation was committed by a person acting under color of state law."[54] "A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.[55]

### A.  We dismiss Mr. Talbert's claims against the state actors in their official capacities.

Mr. Talbert sues the Department of Corrections and Secretary Little, Dietician Cooper, Unit Manager Smith, Counselor Watkins, Mail Inspector Supervisor Long, Lieutenants Garman

6

and McCain, Sergeants Green and Piston, and Correctional Officers Nesmith, Jordan, Bruce, Casey, and Beesley—all of whom are employees of the Pennsylvania Department of Corrections— in their individual and official capacities.[56]

The Eleventh Amendment bars suits against a state and its agencies in federal court which seek monetary damages.[57] "Because the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth . . . it shares in the Commonwealth's Eleventh Amendment immunity."[58] The Commonwealth has not waived its immunity.[59] We dismiss Mr. Talbert's section 1983 claims for monetary damages, to the extent he is bringing any, against the Department of Corrections.

Suits against state officials acting in their official capacities are essentially suits against the employing government agency, and as such, are also barred by the Eleventh Amendment.[60] We dismiss the official capacity claims against the Pennsylvania Department of Corrections employees seeking monetary damages with prejudice because they are essentially claims against the Department of Corrections which are barred by the Eleventh Amendment.[61]

But "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State."[62] For Mr. Talbert's official capacity claims to survive, "[t]he relief sought must be prospective, declaratory, or injunctive relief *governing an officer's future conduct* and cannot be retrospective[.]"[63] To determine whether the claim survives, we "need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."[64] Although Mr. Talbert seeks unidentified "injunctive relief" in his Complaint, he alleges only past conduct of the Department of Corrections

employees and seeks an award of monetary damages for the conduct. Since he alleges no ongoing violation of federal law, his claims cannot be considered prospective in nature.

We now address Mr. Talbert's claims against these state actors in their individual capacities.

### B.  Mr. Talbert fails to state a First Amendment retaliation claim against the named state actors.

Mr. Talbert alleges all the state actors he sues violated his First Amendment right against retaliation.[65] He claims they "acknowledged" him as an incarcerated individual who has filed lawsuits, prison grievances, and complaints about inmate abuse and staff corruption and "[i]n retaliation" used excessive force against him, deprived him of his mail and food, and "placed [him] in harms way" by calling him a snitch.[66] He claims they did so to deter him from filing grievances "for fear of them inflicting serious bodily harm."[67]

The First Amendment protects individuals from retaliatory actions for engaging in protected speech.[68] Mr. Talbert must allege: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him.[69]

As to the first element, "[t]he filing of grievances and lawsuits against prison officials constitutes constitutionally protected activity."[70] Informal, oral grievances may also qualify as constitutionally protected activity.[71] Mr. Talbert broadly alleges the first element, alleging he "filed lawsuits, prison grievances, and complaints against [Department of Corrections] staff members for inmate abuse and corruption."[72]

The second element—whether Mr. Talbert suffered an adverse action—calls for a case-specific analysis.[73] An "adverse action" is one which would "deter a person of ordinary firmness"

from exercising his First Amendment rights.[74] This requirement is not too demanding.[75] The adverse action must amount to more than a trivial inconvenience.[76] But if a "campaign of harassment," while "trivial in detail," becomes substantial cumulatively, it may amount to an actionable adverse action.[77] Mr. Talbert pleads six adverse actions against the state actors alleging they: (1) sprayed him with oleoresin capsicum spray; (2) discontinued his medical diet; (3) called him a snitch; (4) withheld his mail; (5) deprived him of his dinner; and (6) denied him grievance forms.

As to third element—whether Mr. Talbert's constitutionally protected conduct amounted to "a substantial or motivating factor" for the adverse action—Mr. Talbert must allege "which grievances led to the purported retaliation, which prison officials retaliated, and how he knows [ ] their conduct was substantially motivated by his protected activity."[78] Where a causal link cannot be shown with direct evidence, Mr. Talbert may try to satisfy his burden by showing: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link."[79]

Mr. Talbert does not plead a sufficient causal connection between the various grievances and lawsuits he allegedly filed against the "[Department of Corrections] staff members", and the adverse actions other Department of Corrections employees have taken against him.[80] Mr. Talbert alleges, "[a]s a proximate result" of "acknowledge[ing]" Mr. Talbert has filed lawsuits, prison grievance, and complaints, he "has since become a target, where [Department of Corrections] officials, statewide, had established and maintained a motive to retaliate against him, through various forms of illegal, unethical, and unconstitutional misconduct."[81] But, as we describe below, Mr. Talbert's "formulaic recitation of the elements of a [First Amendment retaliation claim] will

not do."[82] We need not accept inferences drawn by Mr. Talbert if they are unsupported by the plead facts.[83]

### 1.    We dismiss Mr. Talbert's First Amendment retaliation claim against Correctional Officer Casey.

Mr. Talbert alleges Correctional Officer Casey sprayed oleoresin capsicum through the vent into his cell causing him to have an asthma attack and requiring medical observation on March 31, 2023.[84] Mr. Talbert broadly pleads all the state actors "collectively acknowledged [Mr. Talbert] as being a [Department of Corrections] [incarcerated individual]" who "filed lawsuits, prison grievances, and complaints against [Department of Corrections] staff members [.]"[85] He claims "[i]n retaliation for this protected conduct" he "suffered adverse action" which "was causally connected" to the exercise of his First Amendment rights.[86] This "formulaic recitation" of the elements of a First Amendment retaliation claim is not sufficient to state a claim.[87]

Mr. Talbert pleads he engaged in protected activity when he filed complaints and grievances against Department of Corrections staff members and suffered an adverse action when Correctional Officer Casey sprayed oleoresin capsicum in his cell. But he does plead facts showing a causal link between the exercise of his constitutional rights—filing complaints and grievances—and the adverse action allegedly taken against him—Correctional Officer Casey spraying him.

Our Court of Appeals three years ago in *Palmore v. Hornberger* considered whether an incarcerated person stated a First Amendment retaliation claim by alleging a correctional officer placed him in lock down, moved him to restricted housing, and charged him with misconduct immediately after the correctional officer learned the person planned to file a grievance against the officer.[88] Our Court of Appeals held the incarcerated individual demonstrated a causal link between a clear protected activity and immediate adverse action, satisfying all three elements of

his retaliation claim.[89] Our Court of Appeals reasoned the incarcerated person showed the officer had been motivated to punish based on the person's request for a grievance.[90]

Unlike the incarcerated person in *Palmore* who alleged the correctional officer acted after learning the incarcerated person planned to file a grievance against him, Mr. Talbert fails to allege a causal link between Correctional Officer Casey's personal knowledge of a complaint or grievance filed against him and him spraying Mr. Talbert. The incarcerated man in *Palmore* pleaded facts showing his constitutionally protected conduct related to the correctional officer, the correctional officer's knowledge of the conduct, and his response. Mr. Talbert's general statement all the officers' "collectively acknowledged" his many lawsuits, prison grievances, and complaints against unidentified staff members fails to provide any context, preventing us from finding the same causal link as in *Palmore.*

We dismiss Mr. Talbert's First Amendment retaliation claim against Correctional Officer Casey without prejudice if Mr. Talbert can amend in good faith with facts showing how Mr. Talbert's filing of grievances and complaints motivated Correctional Officer Casey to punish him.

## 2. We dismiss Mr. Talbert's First Amendment retaliation claim against Correctional Officer Beesley.

Mr. Talbert alleges Correctional Officer Beesley sprayed oleoresin capsicum through the vent into his cell causing him to have an asthma attack and require hospitalization on April 1, 2023.[91] He claims Correctional Officer Beesley oppressed, harassed, and antagonized him with verbal and derogatory remarks and unreasonably banged on his cell door with a metal object causing emotional distress the same day.[92] Mr. Talbert pleads conclusory allegations against all the state actors collectively knowing about his past as an avid litigator and grievance filer. But Mr. Talbert pleads no facts as to which constitutionally protected activity Correctional Officer Beesley responded.[93]

11

Mr. Talbert pleads he engaged in protected activity when he filed complaints and grievances against Department of Corrections staff members and suffered an adverse action when Correctional Officer Beesley sprayed oleoresin capsicum in his cell. And he pleads general facts about his "recent settlement against a former Phoenix employee, Dennis A. Brown."[94] But like his claim against Correctional Officer Casey, Mr. Talbert fails to allege a causal connection or suggestive timing between his alleged protected activity and Correctional Officer Beesley spraying him. Mr. Talbert does not specify when or against whom he filed lawsuits, prison grievances, or complaints beyond Department of Corrections staff members and former employee Brown. So we cannot construe suggestive timing between Correctional Officer Beesley's acts and Mr. Talbert's earlier, unidentified protected activity. Mr. Talbert fails to plead facts allowing us to plausibly infer a causal connection between filing grievances and complaints and Correctional Officer Beesley spraying him on April 1, 2023.

We dismiss Mr. Talbert's First Amendment retaliation claim against Correctional Officer Beesley without prejudice if Mr. Talbert can amend in good faith with facts showing how Mr. Talbert's filing of grievances and complaints motivated Correctional Officer Beesley to punish him.

### 3.    We dismiss Mr. Talbert's First Amendment retaliation claim against Dietician Cooper.

Mr. Talbert alleges Dr. Saikia prescribed him a medical diet on April 27, 2023, Dietician Cooper discontinued it on May 5, 2023, and at some unidentified time Mr. Talbert sued the Department of Corrections, Secretary Little, and his Former Dietician Brown.[95] Mr. Talbert claims Dietician Cooper retaliated against him when he discontinued his medical diet.[96]

Mr. Talbert pleads he filed a lawsuit—which qualifies as protected activity. As for the second element of his retaliation claim, a correctional officer denying food to an incarcerated

individual is sufficient to support the "adverse action" of a retaliation claim.[97] So Mr. Talbert suffered an adverse action when Dietician Cooper discontinued his prescribed medical diet.

Now we look to determine whether Mr. Talbert pleaded facts showing a causal connection between filing a lawsuit against the Department of Corrections, Secretary Little, and former Dietician Brown, and Dietician Cooper discontinuing his diet. We are guided by our Court of Appeals' reasoned decision six years ago in *Pepe v. Lamas*.[98] In *Pepe*, an incarcerated person alleged a prison kitchen supervisor refused to reinstate him into his kitchen job in retaliation for having filed a grievance against the supervisor.[99] Our Court of Appeals held the incarcerated person pleaded a *prima facie* case of First Amendment retaliation against the supervisor because: (1) the person's use of the grievance system qualified as protected activity; (2) he suffered an adverse action when the supervisor did not reinstate him into his kitchen job; and (3) the same supervisor who denied the person's employment is the same person against who he had filed a grievance the month before.[100]

Mr. Talbert does not plead this type of causal connection. Unlike the incarcerated person in *Pepe*, who filed a grievance against the supervisor who took the alleged adverse actions against him, Mr. Talbert does not allege a fact he filed a lawsuit or grievance involving Dietician Cooper— the individual he claims retaliated against him. And our Court of Appeals generally requires "the defendant in First Amendment retaliation actions be aware of the protected conduct in order to establish the requisite causal connection."[101]

Mr. Talbert does not plead facts about how Dietician Cooper knew about the complaint filed against the Former Dietician Brown, or how he knows his complaint against the former dietician substantially motivated Dietician Cooper's conduct. Mr. Talbert "must come forward with more than 'general attacks' upon the defendant's motivations[.]"[102] Mr. Talbert does not

plausibly allege a causal link between his complaints against a different Department of Corrections dietician and alleged retaliation by Dietician Cooper.

We dismiss Mr. Talbert's First Amendment retaliation claim against Dietician Cooper without prejudice if Mr. Talbert can amend in good faith demonstrating a causal link between the exercise of his constitutional rights and the adverse action taken against him.

### 4.    We dismiss Mr. Talbert's First Amendment retaliation claim related to the "snitch" comment.

Mr. Talbert alleges between May and June 2023, Sergeants Green and Piston and Correctional Officers Jordan, Nesmith, and Bruce called him a "snitch" in front of other incarcerated individual "in retaliation of past and recent lawsuits, prison grievances, and complaints about inmate abuse and staff corruption."[103] Mr. Talbert claims they "attempt[ed] to cause hostility and get him injured."[104]

Mr. Talbert pleads he filed lawsuits and grievances—which qualifies as protected activity. And since "[b]eing branded a 'snitch' may have serious consequences to an inmate's health[,]" Mr. Talbert pleaded an adverse action when Sergeants Green and Piston and Correctional Officers Jordan, Nesmith, and Bruce called him a snitch.[105] But he again fails to plead facts about how these state actors knew about his grievances or complaints, or how his protected activity substantially motivated their conduct. His "formulaic recitation" of the elements of a First Amendment retaliation claim again remains insufficient to state a claim.[106]

We dismiss Mr. Talbert's First Amendment retaliation claim relating to the snitch comment against Sergeants Green and Piston and Correctional Officers Jordan, Nesmith, and Bruce without prejudice if he can amend in good faith with facts showing a causal link between the exercise of his constitutional rights and the adverse action taken against him.

5. **We dismiss Mr. Talbert's First Amendment retaliation claim related state actors withholding his mail.**

Mr. Talbert claims Correctional Officers Jordan, Nesmith, and Bruce "routinely depriv[ed]" Mr. Talbert of his "incoming mail and paid-for publications" between May and June 2023 because of his "litigious behavior." [107]

Mr. Talbert pleads he filed a lawsuits and grievances—which qualifies as protected activity—and he suffered an adverse action when Correctional Officers Jordan, Nesmith, and Bruce deprived him of his mail. But he again fails to plead facts about how any of these state actors knew about his grievances or complaints, or how his protected activity substantially motivated their conduct. His conclusory allegation will not suffice.

We dismiss Mr. Talbert's First Amendment retaliation claim against Correctional Officers Jordan, Nesmith, and Bruce, and Mail Inspector Supervisor Long without prejudice if he can show a causal link between the exercise of his constitutional rights and the adverse action taken against him.

6. **We dismiss Mr. Talbert's First Amendment retaliation claim premised on officers depriving him of his dinner.**

Mr. Talbert alleges Sergeants Green and Piston and Lieutenant Garman assisted Correctional Officers Jordan, Nesmith, and Bruce in depriving Mr. Talbert of his dinner sometime between May 25, 2023 and June 2023. [108] He generally alleges individuals collectively knew of his litigious behavior. [109]

Mr. Talbert pleads he filed lawsuits and grievances. They qualify as protected activity. And denying Mr. Talbert food constitutes an adverse action sufficient to deter him from exercising his constitutional rights. [110] But again, Mr. Talbert fails to plead facts showing a causal link between the exercise of his constitutional rights—his filing of lawsuits and grievances—and the adverse action taken against him—depriving him of his dinner.

We dismiss Mr. Talbert's First Amendment retaliation claim against Sergeants Green and Piston, Lieutenant Garman, and Correctional Officers Jordan, Nesmith, and Bruce related to allegedly depriving Mr. Talbert of his dinner without prejudice if he can amend in good faith showing a causal link exists between the exercise of his constitutional rights and the adverse action taken against him.

### 7.    We dismiss Mr. Talbert's First Amendment retaliation claim related to the grievance forms.

Mr. Talbert alleges he asked unidentified persons "repeatedly for a prison grievance" forms to exhaust his administrative remedies at undisclosed times but "Defendants" and "their co-workers" denied him the forms.[111] It is unclear whether Mr. Talbert is alleging these state actors denied him the grievance forms in retaliation for his litigious behavior. But "our obligation [is] to liberally construe a *pro se* litigant's pleadings particularly where the *pro se* litigant is imprisoned."[112]

As we found, Mr. Talbert pleaded a protected action through filing complaints and grievances. And even if we assume unidentified persons "repeatedly" denying him grievance forms amounts to an adverse action, he pleads no facts as to how his protected activity substantially motivated someone's conduct. He does not plead who denied him the form, when they denied him the forms, or how his protected activity substantially motivated the unnamed person's conduct. We will not accept inferences drawn by Mr. Talbert when they are unsupported by pleaded facts.[113]

We dismiss Mr. Talbert's First Amendment retaliation claim related to unnamed persons denying him grievance forms without prejudice.

### C.   We dismiss Mr. Talbert's First Amendment retaliation claims against the supervisors.

Mr. Talbert sues Secretary of the Department of Corrections George Little, Unit Manager Smith, Counselor Watkins, and Lieutenant McCain for First Amendment retaliation under a

"supervisory liability" theory. He claims Unit Manager Smith, Counselor Watkins, and Lieutenant McCain "possess a supervisory role" at SCI Phoenix and retaliated against Mr. Talbert because they knew correctional officers called him a snitch, withheld his mail, and denied him food but refused to investigate these issues.[114] Mr. Talbert claims Unit Manager Smith, Counselor Watkins, and Lieutenant McCain turned a blind eye to their subordinates' conduct without investigation and are personally liable as supervisors.[115] Mr. Talbert also alleges Secretary Little violated his rights by acting with gross negligence toward his subordinates' acts; knowing and failing to act or fix unconstitutional acts of his subordinates with deliberate indifference; failing to inform, train, supervise, and discipline his staff on policies to avoid constitutional violations; and enforcing unconstitutional and unlawful policies and customs.[116]

We recognize two theories of supervisory liability under section 1983.[117] Supervisors may face liability for unconstitutional acts undertaken by subordinates when: (1) they participated in violating an individual's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct, making them personally liable under section 1983; or (2) they created and upheld a policy, practice, or custom, with "deliberate indifference to the consequences[,]" which directly caused the constitutional harm.[118] But "liability may not be based solely on a theory of *respondeat superior*; the official must have had some personal involvement in the events giving rise to the cause of action."[119]

Under the first theory, generalized allegations a supervisory state actor is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation.[120] To establish knowledge and acquiescence of a subordinate's misconduct, Mr. Talbert must allege the supervisor's: "(1) contemporaneous knowledge of the offending incident or knowledge of similar incidents in the past, and (2) actions or inactions which

communicated approval of the subordinate's behavior."[121] Alleging the supervisor "had constructive knowledge of a subordinate's unconstitutional conduct simply because of his role as a supervisor" does not suffice.[122]

We are guided by our Court of Appeals' analysis three years ago in *Saisi v. Murray* addressing an incarcerated person's claim to hold the jail warden, among others, liable for unconstitutional conditions of confinement based on supervisory liability.[123] The person did not plead facts showing the jail warden's actual knowledge of the violations or his participation in them.[124] The supervisory liability theory relied on his own "belief" the jail warden would "tolerate" violations occurring in the jail.[125] Our Court of Appeals held the jail warden cannot be liable as a supervisor "simply because of his position" without more facts about his knowledge or participation.[126]

To state a claim under the second theory, Mr. Talbert must: "(1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or practice created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk, and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure."[127]

Like the incarcerated person in *Saisi*, whose supervisory liability theory relied on his own "belief", Mr. Talbert pleads no facts showing Secretary Little's actual knowledge or participation under the first theory of supervisory liability. Without more, Mr. Talbert's conclusory claims about Secretary Little resemble the incarcerated individual's claims in *Saisi*—seeking liability based on job title rather than facts. And Mr. Talbert's claim fails under the second theory because he does

not identify a specific policy, practice, or custom resulting in a violation of his constitutional rights nor Secretary Little's knowledge of the policy, practice, or custom.

Mr. Talbert also pleads no facts showing Manager Smith, Counselor Watkins, or Lieutenant McCain, Sergeants Green and Piston and Officers Jordan, Nesmith, and Bruce are supervisors. If Mr. Talbert seeks to hold Unit Manager Smith, Counselor Watkins, and Lieutenant McCain liable for knowledge and acquiescence, he must show they are "the person in charge."[128] Mr. Talbert still fails to state a claim even if we assume they are in charge. Mr. Talbert alleges these supervisors "turn[ed] a blind eye" to the correctional officers retaliating against Mr. Talbert.[129] Although a supervisor cannot encourage constitutional violations, a supervisor "has [no] affirmative constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates."[130] So alleging Unit Manager Smith, Counselor Watkins, and Lieutenant McCain "turned a blind eye" to the unconstitutional practices of their subordinates is not sufficient to impose supervisor liability.[131]

We dismiss Mr. Talbert's claims against Secretary Little, Unit Manager Smith, Counselor Watkins, and Lieutenant McCain based on supervisory liability without prejudice.

**D.  Mr. Talbert fails to allege a First Amendment freedom of speech claim.**

Mr. Talbert claims Lieutenant Garman, Sergeants Green and Piston, and Correctional Officers Jordan, Nesmith and Bruce aided by Mail Inspector Supervisor Long violated his freedom of speech by depriving him of "incoming mail and publications."[132]

The First Amendment prohibits state actors from "abridging the freedom of speech."[133] "[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment."[134] Our Court of Appeals directs "state prisoners, by virtue of their incarceration, 'do not forfeit their First Amendment right to use of the mails,' . . . and [ ] a 'pattern and practice of

opening properly marked incoming [legal] mail outside an inmate's presence infringes communication protected by the right to free speech.'"[135] Our Court of Appeals stressed "a pattern and practice of opening properly marked court mail is particularly troubling because it 'chills protected expression and may inhibit the inmate's ability to speak, protest, and complain openly, directly, and without reservation with the court.'"[136] So a pattern, practice, or policy "of opening legal mail outside the presence of the addressee inmate interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the inmate's right to freedom of speech."[137]

To state a claim under the First Amendment for interference with *legal* mail, Mr. Talbert must allege: (1) "pattern and practice" or an "explicit policy" which (2) "interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the inmate's right to freedom of speech."[138] Judge Mehalchick considered a First Amendment claim based on an incarcerated person alleging various officials interfered with his outgoing legal mail in *Castillo v. All Jane/John Does of Deputized Postal Officers at All Facilities Plaintiff Was Incarcerated*.[139] The incarcerated person alleged four instances where officials did not promptly deliver his mail.[140] But Judge Mehalchick dismissed his First Amendment mail interference claim because he relied "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which is not sufficient to state a claim.[141] She explained "[i]solated instances of outgoing inmate mail being lost or confiscated, without more, do not amount to a constitutional violation."[142]

In *Nixon v. Secretary Pennsylvania Department of Corrections*, an incarcerated person alleged a single incident of interference with his personal mail when the prison mail room

confiscated his incoming personal mail.[143] Our Court of Appeals held isolated interferences with personal mail is insufficient to state a claim.[144]

Like the incarcerated individual in *Nixon*, who alleged outgoing *personal* inmate mail being lost or confiscated, Mr. Talbert baldly alleges Lieutenant Garman, Sergeants Green and Piston, and Correctional Officers Jordan, Nesmith and Bruce aided by Mail Inspector Supervisor Long violated his freedom of speech by depriving him of "incoming mail and publications."[145] He claims Mail Inspector Supervisor Long failed to "maintain a strict mailroom delivery system[.]"[146] But he pleads no facts to establish a "pattern and practice" of mail interference. And he pleads no facts anyone interfered with his *legal* mail. He only alleges they "routinely" interfered with "incoming mail and paid-for publication" without alleging how they interfered with his mail, what type of mail they interfered with, or how often it happened.[147] As Judge Mehalchick stressed in *Castillo*, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice and "[i]solated instances" of "mail being lost or confiscated, without more, do not amount to a constitutional violation."[148]

We dismiss Mr. Talbert's First Amendment mail interference claim against Lieutenant Garman, Sergeants Green and Piston, Correctional Officers Jordan, Nesmith and Bruce, and Mail Inspector Supervisor Long without prejudice.

### E. Mr. Talbert pleads Eighth Amendment claims against Sergeants Green and Piston and Correctional Officers Casey, Beesley, Jordan, Nesmith, and Bruce.

Mr. Talbert claims Correctional Officers Jordan, Nesmith, Bruce, Casey and Beesley, Lieutenant Garman, and Sergeants Green and Piston violated his Eighth Amendment right to be free from cruel and unusual punishment. He claims they deprived him "humane, civilized, and decent conditions of confinement" by denying him food and safety.[149] He alleges they (1) sprayed

him with oleoresin capsicum spray; (2) called him a "snitch"; (3) deprived him of food; and (4) denied him his medical diet.

### 1. Mr. Talbert states an Eighth Amendment claim for excessive force against Correctional Officers Casey and Beesley.

Mr. Talbert alleges Correctional Officers Casey and Beesley unlawfully sprayed oleoresin capsicum spray into his cell on two occasions while incarcerated at SCI Coal Township.[150] Mr. Talbert claims Correctional Officer Casey sprayed him upon seeing his covered cell door vent, causing him to asphyxiate and sending him into the infirmary to treat his injuries.[151] Mr. Talbert claims Correctional Officer Beesley sprayed him again after his release from the infirmary.[152]

The Eighth Amendment prohibits cruel and unusual punishment including correctional officers inflicting "unnecessary and wanton" pain on incarcerated individuals.[153] Use of excessive force against an incarcerated individual may constitute cruel and unusual punishment even when the injury is not "serious."[154] But the Supreme Court in *Wilkins v. Gaddy* instructs us not any "malevolent touch" or "push or shove" by a correctional officer "gives rise to a federal cause of action."[155] But even an incarcerated individual who "has the good fortune to escape without serious injury" can pursue an excessive force claim.[156] We look at the nature of force used.[157]

Eighth Amendment claims have an objective and subjective component.[158] A correctional officer must "act with a sufficiently culpable state of mind" and the conduct must be "objectively harmful" to the incarcerated individual.[159] We look at whether the officer applied force "in a good faith effort to maintain or restore discipline" or if he used force "maliciously and sadistically[.]"[160] When evaluating the officer's interest we consider: (1) the need for using force; (2) the relationship between force used and necessary force; (3) the injury inflicted; (4) the threat to safety of incarcerated individuals and staff as perceived by the officers; and (5) mitigation efforts to "temper the severity of the forceful response."[161]

22

A correctional officer's use of oleoresin capsicum spray can be considered excessive force when it does not further an effort to maintain or restore discipline.[162] But it is not a violation of the Eighth Amendment to use oleoresin capsicum spray on an incarcerated individual if they repeatedly disobey a correctional officer's order.[163]

Mr. Talbert pleads Correctional Officers Casey and Beesley injured him when they sprayed him with oleoresin capsicum spray given his asthma which led him to asphyxiate and caused other respiratory system complication which landed him in the infirmary two times.[164] As pleaded, this injury is not *de minimis*. Turning to the nature of force used, the events as Mr. Talbert pleaded, allow us to plausibly infer the Correctional Officers used the oleoresin capsicum spray not to maintain or restore discipline but instead to cause Mr. Talbert harm.[165] Mr. Talbert alleges he did not provoke the Correctional Officers or disregard their orders during the two separate oleoresin capsicum spray incidents.[166] He instead claims Correctional Officers Casey and Beesley "maliciously, sadistically, and with reckless indifference" sprayed him while he sat in the cell.[167] We will await the officers' responses and discovery.

Mr. Talbert sufficiently pleaded Correctional Officers Casey and Beesley's use of oleoresin capsicum spray as unnecessary and malicious force violating the Eighth Amendment.

### 2.   Mr. Talbert states an Eighth Amendment claim for being called a "snitch" against Sergeants Green and Piston and Correctional Officers Jordan, Nesmith, and Bruce.

Mr. Talbert claims Sergeants Green and Piston and Correctional Officers Jordan, Nesmith, and Bruce called him a "snitch" to other incarcerated individuals "to cause hostility and get [Mr. Talbert] injured" between May and June 2023.[168] Mr. Talbert alleges he suffered "both physical and psychological harm" from the comments.[169]

Prison officials have a duty to protect incarcerated individuals from violence at the hands of other incarcerated individuals.[170] "Being violently assaulted in prison is simply not a part of

the penalty that criminal offenders pay for their offenses against society."[171] "[B]eing branded a 'snitch' may have serious consequences to an inmate's health."[172] So calling an incarcerated individual a "snitch" and subjecting them to "substantial risk of harm" can be "sufficient to state an Eighth Amendment claim."[173] But our Court of Appeals in *Brown v. Deparlos* held verbal harassment "without more" does not violate the Eighth Amendment.[174] And a correctional officer who "acts reasonably" does not violate the Eighth Amendment.[175]

Judge Leeson considered whether calling an incarcerated person a "snitch" constituted an Eighth Amendment violation in *Woolfolk v. Meier*.[176] In *Woolfolk,* the incarcerated person alleged the correctional officer called him a "snitch" in front of other incarcerated persons which led him to be "harassed and threatened[.]"[177] Judge Leeson recognized how "[v]erbal harassment of a prisoner, without more, does not violate the Eighth Amendment."[178] But Judge Leeson acknowledged our Court of Appeals has recognized being labeled a "snitch" may constitute an Eighth Amendment violation if the prison official "acted with deliberate indifference to a substantial risk of serious harm to the inmate."[179] So Judge Leeson held—viewing the facts in the light most favorable to the incarcerated person—he stated a claim under the Eighth Amendment against the correctional officer.[180]

Like in *Woolfolk,* where the incarcerated person alleged the correctional officer called him a snitch in front of other inmates which led him to being harassed and threatened, Mr. Talbert alleges Sergeants Green and Piston and Correctional Officers Green, Piston, Jordan, Nesmith, and Bruce called him a snitch to his face and to other incarcerated individuals.[181] He claims the Correctional Officers placed the "snitch" label on him which "caused [him] both physical and psychological harm."[182] Because Mr. Talbert "has raised a factual issue as to whether [Sergeants Green and Piston and Correctional Officers Green, Piston, Jordan, Nesmith, and Bruce] referred

to him as a snitch in front of other inmates and did so knowing that this placed [him] at a substantial risk of serious harm, this claim will not be dismissed."[183]

Mr. Talbert sufficiently pleaded an Eighth Amendment claim against Sergeants Green and Piston, and Correctional Officers Green, Piston, Jordan, Nesmith, and Bruce for calling him a snitch.

> ### 3. Mr. Talbert states an Eighth Amendment claim for food deprivation against Lieutenant Garman, Sergeants Green and Piston, and Correctional Officers Jordan, Nesmith, and Bruce.

Mr. Talbert claims Lieutenant Garman, Sergeants Green and Piston, and Correctional Officers Jordan, Nesmith, and Bruce "intentionally, maliciously, and willfully" deprived him of his dinner between May 25, 2023 and June 2023.[184]

There is no Constitutional requirement for "comfortable prisons."[185] But the Eighth Amendment requires prisons provide "humane conditions of confinement" meaning they must ensure incarcerated individual "receive adequate food, clothing, shelter, and medical care," and must "take reasonable measures to guarantee the safety of the inmates[.]"[186] Eighth Amendment claims for inadequate conditions of confinement must pose "substantial risk of serious harm."[187] The Supreme Court in *Farmer v. Brennan* held Eighth Amendment claims for the deprivation of humane conditions by prison officials must be: (1) "sufficiently serious;" and (2) inflict "unnecessary and wanton" pain on the incarcerated individual.[188]

An incarcerated individual can claim inadequate food conditions for either deprivation of food or unsanitary food.[189] But the incarcerated individual must claim they suffered "a distinct and palpable injury" satisfying an inadequate food claim.[190] In *Rieco v. Moran*, our Court of Appeals held an injury under a food deprivation claim cannot arise from deprivation of a single meal.[191] Our Court of Appeals upheld Judge Schwab's denial of an incarcerated person's Eighth Amendment claim for food deprivation because he only alleged one instance of missing a meal.[192]

Our Court of Appeals reasoned an Eighth Amendment claim for food deprivation requires "a substantial deprivation of food to [an incarcerated individual]."[193]

Mr. Talbert alleged sometime between May 25, 2023 and June 2023, Lieutenant Garman, Sergeants Green and Piston, and Correctional Officers Jordan, Nesmith, and Bruce "intentionally, maliciously, and willfully" deprived him of "his dinner meal[.]"[194] He claims "[t]he deprivation of food adversely affected [his] serious digestive medical condition for several consecutive nights causing him to suffer from starvation, dehydration, fatigue, and malnourishment."[195] Mr. Talbert does not plead facts about how many times they deprived him of his dinner meal. But Congress instructs us to construe the facts liberally when screening a *pro se* individual's claim.[196] So while the language is unclear, we construe Mr. Talbert's claim to encompass multiple occasions where Lieutenant Garman, Sergeants Green and Piston, and Correctional Officers Jordan, Nesmith, and Bruce deprived him dinner. Mr. Talbert pleaded the deprivation caused "starvation, dehydration, fatigue, and malnourishment."[197] Taken as true, these injuries are "sufficiently serious" to uphold an Eighth Amendment claim for food deprivation. We await the officers' response and discovery.

Mr. Talbert can proceed on this claim against Lieutenant Garman, Sergeants Green and Piston, and Correctional Officers Jordan, Nesmith, and Bruce. But he will need facts to support this claim going forward.

### 4.    Mr. Talbert states an Eighth Amendment claim for deliberate indifference against Dietician Cooper.

Dr. Saikia prescribed Mr. Talbert a "medical therapeutic diet" on April 27, 2023.[198] Dietician Cooper discontinued Mr. Talbert's prescribed diet less than a week later on May 5, 2023.[199] Mr. Talbert sues Dietician Cooper for deliberate indifference alleging he suffered "adverse health issues" from the discontinued diet including "hunger pain, starvation, dehydration, fatigue, [and] malabsorption of vitamins and minerals[.]"[200]

The Eighth Amendment prohibits deliberate indifference to a prisoner's serious medical need.[201] A medical need is "serious" under circumstances where: (1) "it has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would recognize the need for treatment;" or (2) "denial or delay in providing medical care results in unnecessary or wanton infliction of pain."[202] "Deliberate indifference" may be shown by "an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury" or by "persistent conduct in the face of resultant pain and risk of permanent injury."[203] But "[m]ere negligence or mere disagreement about a course of treatment does not state a claim of cruel and unusual punishment."[204] And "[a]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."[205]

Mr. Talbert's alleges Dietician Cooper: (1) knew of Mr. Talbert's medically prescribed diet; and (2) proceeded to deny his prescribed medical care knowing the potential health consequences to Mr. Talbert.[206] The medical diet helped Mr. Talbert abate his "serious medical condition."[207] Mr. Talbert pleads Dietician Cooper disregarded Mr. Talbert's safety when he discontinued the prescribed medical diet and exposed him to further injury.[208]

At this stage, we will allow Mr. Talbert to proceed on his Eighth Amendment deliberate indifference claim against Dietician Cooper for discontinuing his prescribed medical diet.

### F. Mr. Talbert states a Fourteenth Amendment claim for being sprayed with oleoresin capsicum spray against Correctional Officers Casey and Beesley.

Mr. Talbert sues Correctional Officers Casey and Beesley under the Due Process clause of the Fourteenth Amendment for "depriv[ing] [him] of his protected liberty interest by spraying him with [oleoresin capsicum] spray within a [twenty-four] hour period."[209] He claims the "[Department of Corrections] policy and State health laws had created a liberty interest for [him]

27

not to be subject to the use of force with [oleoresin capsicum] spray[,]" and the Correctional Officers' deprivation of this alleged liberty interest "imposed an atypical and significant hardship upon [him] by reason of him being asthmatic and him being placed at risk of serious bodily injury."[210]

Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law[.]"[211] The Fourteenth Amendment's Due Process clause protects both substantive and procedural due process rights.[212] The relevant inquiry in determining whether government conduct violates substantive due process "is whether the behavior of the government officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."[213] Mr. Talbert must establish "the loss of a protected property interest without adequate process" to succeed on a Fourteenth Amendment procedural due process claim.[214]

Mr. Talbert appears to bring a substantive due process claim against Correctional Officers Casey and Beesley because he claims the Correctional Officers deprived him of his "protected liberty interest" by "maliciously, sadistically, and with reckless indifference to [his] asthma," spraying him with oleoresin capsicum spray as a person with asthma causing him "an atypical and significant hardship."[215] We must determine whether a correctional officer's use of oleoresin capsicum spray on an incarcerated individual can "shock the contemporary conscience."[216]

Our Court of Appeals has addressed correctional facility officers' conduct in the "shocks the conscience" context.[217] In *Passmore v. Ianello*, an incarcerated individual sued a correctional officer alleging a violation of the Eighth Amendment and substantive due process for spraying him with oleoresin capsicum spray and leaving him unattended for twenty minutes.[218] Our Court of

Appeals held conduct does not "shock the conscience" if the same conduct is not considered excessive force in an Eighth Amendment claim.[219]

Mr. Talbert alleges he had his cell window covered and Correctional Officer Casey began to spray Mr. Talbert with the oleoresin capsicum spray through the vent unprovoked which led to him having to go to the infirmary.[220] Unnamed officers released Mr. Talbert from the infirmary less than twenty-four hours later.[221] Mr. Talbert began to clean the residue from his belongings from the first spray incident, and Correctional Officer Beesley approached his cell, tormented him with shouting and banging on his cell, and proceeded to spray him through the vent again.[222] The conduct Mr. Talbert alleges is based upon the same allegations as his Eighth Amendment claims of cruel and unusual punishment which can proceed. Though stated generally, Mr. Talbert alleges in both instances the Correctional Officers acted maliciously, sadistically, and with reckless indifference to his known asthmatic condition.[223] He will later need evidence to support these claims.

At this early stage of the litigation, Mr. Talbert's allegations, construed liberally, are sufficient to proceed with his Due Process claim against Correctional Officers Casey and Beesley.

### G. Mr. Talbert states a claim under the Americans with Disabilities Act for his respiratory and circulatory disabilities against the Department of Corrections.

Mr. Talbert sues the Department of Corrections for violating the Americans with Disabilities Act.[224] Mr. Talbert claims, during May 2023 and June 2023, the Department of Corrections discriminated against him based on: (1) his respiratory disability of asthma by spraying him with oleoresin capsicum spray; (2) his circulatory disability of hypertension by intentionally subjecting him to physical and psychological stress; and (3) his gastrointestinal disability by failing to provide him with a prescribed therapeutic diet.[225]

Congress, through Title II of the Americans with Disabilities Act, provides "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[226] To establish an Americans with Disabilities Act claim, Mr. Talbert must first plead: (1) "he is a qualified individual with a disability," (2) "who was precluded from participating in a program, service, or activity, or otherwise subject to discrimination," (3) "by reason of his disability."[227] The definition of discrimination under the Act includes "… adverse actions motivated by prejudice and fear of disabilities, [and] also includes failing to make reasonable accommodations for [an individual's] disabilities."[228]

And although the Department is immune for claims brought under section 1983, "there is an exception that states may be sued because of violations of the Americans with Disabilities Act."[229]

### 1. Mr. Talbert states an Americans with Disabilities Act claim for his respiratory system disability against the Department of Corrections.

Mr. Talbert alleges the Department of Corrections failed to properly accommodate his respiratory disability—asthma—by failing to "reasonably modify its policies, practices, and training procedures as they relate to the use of [oleoresin capsicum] spray on individuals with asthma and other respiratory system disabilities."[230] Mr. Talbert alleges the Department allowed for its employees to "intentionally and maliciously cause [him] to asphyxiate and suffer from breathing complications by using [oleoresin capsicum] spray on him with knowledge of him having asthma."[231]

Mr. Talbert sufficiently pleads the three elements of a disability discrimination claim.[232] He alleges an unnamed medical provider diagnosed him with a respiratory disability between March 2023 and May 2023.[233] He alleges the Department knew of, yet failed to reasonably

30

accommodate his disability, which enabled Corrections Officers Casey and Beesley to spray him with the oleoresin capsicum spray "intentionally and maliciously" to cause harm with the knowledge he had asthma.[234] And he alleges the officers discriminated against him because of his disability given they "intentionally and maliciously cause[d] [Mr. Talbert] to asphyxiate and suffer breathing complications" by using oleoresin capsicum spray on him.[235]

At this early stage, Mr. Talbert states an Americans with Disabilities Act claim for his respiratory system disability against the Department of Corrections.

### 2. Mr. Talbert states an Americans with Disabilities Act claim for his circulatory system disability against the Department of Corrections.

Mr. Talbert alleges the Department of Corrections failed to properly accommodate his circulatory disability by failing to "modify its policies and practices, and training procedures as they relate to interacting with people with hypertension and other circulatory system disabilities."[236] Mr. Talbert alleges the Department "allow[ed] for its employees to intentionally and maliciously elevate [Mr. Talbert's] blood pressure through physical and psychological stress with intent to cause bodily injury."[237]

Mr. Talbert sufficiently pleads the three elements of a disability's discrimination claim. He sufficiently alleges has a circulatory disability.[238] He alleges the Department's employees subjected him to discrimination by "intentionally and maliciously elevat[ed] [his] blood pressure through ongoing physical and psychological stress" when they "oppress[ed], harass[ed], and antagonize[d] [Mr. Talbert] with both verbal and derogatory remarks and [] unreasonably bang[ed] on his door with a metal object causing intense emotional distress."[239] And Mr. Talbert alleges the Department's employees discriminated against him because of his disability—they "intentionally and maliciously elevate[d] [his] blood pressure through ongoing physical and psychological stress with intent to cause bodily injury."[240]

31

As this stage, Mr. Talbert states an Americans with Disabilities Act claim for his circulatory system disability against the Department of Corrections.

### 3. We dismiss Mr. Talbert's Americans with Disabilities Act claim for his digestive system disability against the Department of Corrections.

Mr. Talbert alleges the Department of Corrections failed to properly accommodate his digestive disability by failing to "modify its policies and practices to conform with State health laws as they relate to powers and duties of dieticians."[241] Mr. Talbert alleges the Department "allow[ed] its dietician(s) to intentionally and maliciously circumvent State health laws for the sole purpose of discontinuing a prescribed therapeutic diet that was established for the maintenance of [Mr. Talbert's] digestive system disability."[242]

Congress's definition of discrimination under the Act includes failing to make reasonable accommodations for Mr. Talbert's disabilities. But providing inadequate medical care, even if related to a disability and even if such conduct amounts to negligence, is not actionable discrimination under the Americans with Disabilities Act.[243] The Act prohibits discrimination against exclusion from programs or services on the basis of disability, but not the simple denial of treatment.[244]

Mr. Talbert alleges the Department deprived him of his prescribed diet.[245] He claims the Department should have modified its policies to ensure Mr. Talbert received and maintained a "medically prescribed diet" for his disability.[246] But the inability to receive a special diet does not constitute an Americans with Disabilities Act violation. The Act prohibits disability-based discrimination, "not inadequate treatment for the disability."[247]

We dismiss Mr. Talbert's Americans with Disabilities Act claim regarding his medical diet without prejudice.

**H.  Mr. Talbert states assault and battery claims against Correctional Officers Casey and Beesley.**

Mr. Talbert sues Correctional Officers Casey and Beesley for assault and battery for using the oleoresin capsicum spray on him on March 31, 2023 and April 1, 2023.[248]

We look to Pennsylvania state law to determine whether Mr. Talbert pleads a state law tort claim for assault or battery.[249] "Assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person."[250]  In *Moore v. Rosa*, Judge McHugh considered a pre-trial detainees' Pennsylvania state law claims for assault and battery related to a pepper spray incident.[251] Judge McHugh declined to dismiss the state law claims because those claims had been based on the same facts which supported the pre-trial detainee's excessive force claim related to the pepper spraying incident.[252]

Like the pre-trial detainee in *Moore*, the facts supporting Mr. Talbert's state law claims for assault and battery are the same facts as those supporting his excessive force claims against Correctional Officers Casey and Beesley. We found those facts sufficient to state an excessive force claim, so we will allow his assault and battery claims to proceed.

Mr. Talbert can proceed with his state law claims of assault and battery against Correctional Officers Casey and Beesley.

**I.  We dismiss Mr. Talbert's civil conspiracy claim.**

Mr. Talbert seeks damages for a civil conspiracy against "all named Defendants," alleging "[t]he object of the Defendants' conspiracy was to violate [Mr. Talbert's] constitutional right to humane, civilized, and decent conditions of confinement as shown by their calculated corrupt endeavors that were carried out in a routine matter and in close proximity with each other."[253]  He claims they all pursued "a common plan or design to inflict" harm on Mr. Talbert and all "had

33

actively taken part in it, whether by act or omission, cooperation, aid and/or, through encouragement." [254]

To state a claim for civil conspiracy under section 1983, Mr. Talbert must show: (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy.[255] The essence of a conspiracy is "an agreement or concerted action between individuals."[256] Mr. Talbert must "allege with particularity and present material facts which show the purported conspirators reached some understanding or agreement or plotted, planned and conspire together to deprive [him] of a protected federal right . . . [Mr. Talbert] cannot rely on subjective suspicions and unsupported speculation."[257]

Mr. Talbert's "allegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action."[258] The elements of a claim of conspiracy to violate federal civil rights are: "(1) two or more persons conspire to deprive any person of [constitutional rights]; (2) one or more of the conspirators performs . . .  any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States," with the added gloss under section 1983 "the conspirators act 'under the color of state law.'"[259] And we are mindful "[a] conspiracy claim cannot be based merely on suspicion or speculation."[260] As Judge Huyett recognized about thirty years ago in *Hammond v. Creative Financial Planning Organization Inc.*, a party fails to allege a civil rights conspiracy claim where the facts alleged are "sketchy, episodic, and uneven" and "jump from one isolated event to another" while "expect[ing] the reader to fill in the gaps[.]"[261]

Mr. Talbert does not plead the first element of a civil conspiracy claim. He pleads no facts alleging the existence of an agreement between the Department's employees to harm him. Mr.

Talbert alleges all the state actors he sues "in pursuance of a common plan or design to inflict physical and/or psychological harm upon [him], had actively taken part in it, whether by act or omission, cooperation, aid, and/or through encouragement."[262] But he does not allege any of the named Department of Corrections staff communicated with one another and agreed to harm him. Mr. Talbert must plead "an agreement or understanding between the defendants to carry out the alleged chain of events; [his] mere assertion that such a plot exists is simply not sufficient. Establishing the existence of an agreement is part of the prima facie case for civil conspiracy under 42 U.S.C. § 1983[.]"[263]

We dismiss Mr. Talbert's civil conspiracy claim without prejudice if he can amend in good faith to show facts of an agreement between the state actors to violate his constitutional rights.

## III.    Conclusion

Mr. Talbert sues the Department of Corrections and its employees in both their individual and official capacities alleging they violated his constitutional rights. We dismiss Mr. Talbert's official capacity claims seeking monetary damages with prejudice because the Department of Corrections and its employees are immune from suit under the Eleventh Amendment.

We dismiss without prejudice Mr. Talbert's First Amendment retaliation claims against Correctional Officers Casey and Beesley for spraying him with oleoresin capsicum spray; Dietician Cooper for discontinuing his medical diet; Sergeants Green and Piston and Correctional Officers Jordan, Nesmith, and Bruce for calling him a snitch; Correctional Officers Jordan, Nesmith, and Bruce, and Mail Inspector Supervisor Long for withholding his mail; Sergeants Green and Piston, Lieutenant Garman, and Correctional Officers Jordan, Nesmith, and Bruce for depriving him of his dinner; unnamed persons for withholding grievance forms; and Department of Corrections George Little, Unit Manager Smith, Counselor Watkins, and Lieutenant McCain

for First Amendment retaliation under a "supervisory liability" theory. We also dismiss without prejudice Mr. Talbert First Amendment freedom of speech claim against Lieutenant Garman, Sergeants Green and Piston, Correctional Officers Jordan, Nesmith and Bruce, and Mail Inspector Supervisor Long for withholding Mr. Talbert's incoming mail. And we dismiss Mr. Talbert's civil conspiracy claim against "all named Defendants" without prejudice.

We allow Mr. Talbert to proceed with his Eighth Amendment claims against Correctional Officers Casey and Beesley for spraying him with oleoresin capsicum; Sergeants Green and Piston and Correctional Officers Jordan, Nesmith, and Bruce for calling him a snitch; Lieutenant Garman, Sergeants Green and Piston, and Correctional Officers Jordan, Nesmith, and Bruce for depriving him of his dinner; and Dietician Cooper for discontinuing his prescribed medical diet. Mr. Talbert states a Fourteenth Amendment substantive due process claim for being sprayed with oleoresin capsicum spray against Correctional Officers Casey and Beesley, along with state law claims for assault and battery against these Correctional Officers Casey and Beesley.

Mr. Talbert may also proceed against the Department of Corrections under the Americans with Disabilities Act for discriminating against him based on his respiratory and circulatory disabilities. But we dismiss his claim brought under the Act related to his gastrointestinal disability. We also dismiss his civil rights conspiracy claims.

---

[1] ECF No. 1 ¶ 45.

[2] *Id.* ¶¶ 45–47.

[3] *Id.* ¶ 53.

[4] *Id.* ¶ 54.

---

[5] We detailed Mr. Talbert's history of filing complaints while incarcerated including his status as a "three-strike" serial litigant in our April 5, 2019 memorandum in *Talbert v. Carney*. Nos. 19-1340, 19-1341, 2019 WL 1516940, at *3 n.19 (E.D. Pa. Apr. 5, 2019). Mr. Talbert filed "at least fifty-four lawsuits" in our District by April 2019. *Id.* at *3. He had at least four pro se complaints dismissed for being frivolous or failing to state a claim from 2013 to 2016. *Id.* We reviewed his April 2019 complaint in *Talbert v. Carney* under Section 1915(g), and required Mr. Talbert plead imminent danger of serious physical injury. *Id.* We declined his motion to proceed *in forma pauperis* because he did not plead imminent danger. *Id.* The Commonwealth will, from time to time, settle one or two of the over seventy cases filed by Mr. Talbert. Judges either dismiss or juries reject the remainder of his claims.

[6] ECF Doc. No. ¶ 13.

[7] *Id.* ¶ 16.

[8] *Id.*

[9] *Id.* ¶ 17. Mr. Talbert does not identify the first names of most of the correctional officers. He may need to identify those first names to effect service.

[10] *Id.* ¶ 18.

[11] *Id.* ¶¶ 18–19.

[12] *Id.* ¶ 20.

[13] *Id.* ¶¶ 21–22.

[14] *Id.* ¶ 23.

[15] *Id.* ¶ 24.

[16] *Id.* ¶ 25.

[17] *Id.*

[18] *Id.* ¶ 26.

[19] *Id.* ¶ 27.

[20] *Id.*

[21] *Id.* ¶ 28.

[22] *Id.* ¶¶ 35–39. Mr. Talbert alleges the Department of Corrections video recorded the "misconduct" through its "surveillance monitors" at SCI Coal Township and SCI Phoenix. *Id.* ¶ 40.

[23] *Id.* ¶ 88.

[24] *Id.* ¶¶ 29, 31.

[25] *Id.* ¶ 29.

[26] *Id.* ¶ 30.

[27] *Id.* ¶ 34.

[28] *Id.* ¶ 35.

[29] *Id.*

[30] *Id.*

[31] *Id.* ¶ 36.

[32] *Id.*

[33] *Id.*

[34] *Id.* ¶ 37.

[35] *Id.*

[36] *Id.* ¶ 38.

[37] *Id.* ¶ 39.

[38] *Id.*

[39] *Id.* ¶¶ 1–12.

[40] *Id.* ¶¶ 14–15, 36.

[41] *Id.* ¶¶ 54–59.

[42] *Id.* ¶¶ 60–99. Mr. Talbert also filed a Petition to excuse his failure to exhaust his administrative remedies due to "retaliation and intimidation, and not being provided grievance forms" at the same time he filed his Complaint. *See* ECF No. 3. A failure to exhaust available administrative remedies is an affirmative defense. *Williams v. Wetzel*, No. 23-1562, 2023 WL 4700650, at *2 (3d Cir. July 24, 2023). So we will not consider it when screening Mr. Talbert's Complaint under 28 U.S.C. § 1915A because we cannot conclude such a result is so obvious from the face of the Complaint as to permit *sua sponte* dismissal. *Dennis v. Boulos*, No. 21-655, 2023 WL 4488981, at *4 (D. Del. July 12, 2023).

Since filing his Complaint, Mr. Talbert filed a Petition for Help dated June 1, 2023 and an Application for Emergency Relief dated June 20, 2023. *See* ECF Nos. 5, 15. We reviewed these filings and notified the Facility where Mr. Talbert is incarcerated. We denied a preliminary

injunction as lacking a fact basis to challenge the state actors' alleged ongoing conduct. *See* ECF No. 2.  Mr. Talbert is also not in the same prison now. ECF No. 16.

[43] *Id.*

[44] *Shane v. Fauver*, 213 F.3d 113, 116 n.2 (3d Cir. 2000).

[45] 28 U.S.C. § 1915A(a).

[46] 28 U.S.C. § 1915A(b)(1).

[47] *Turner v. Dist. Att'y Philadelphia Cnty.,* No. 22-0491, 2022 WL 1568395, at *3 (E.D. Pa. May 18, 2022) (citing *Neal v. Pa. Bd. of Prob. & Parole,* No. 96-7923, 1997 WL 338838, at *1 (E.D. Pa. June 19, 1997); *Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999)).

[48] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotations omitted).

[49] *Elansari v. Univ. of Pennsylvania*, 779 F. App'x 1006, 1008 (3d Cir. 2019) (citing *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000)) (quoting *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012)).

[50] *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (quoting *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011) and citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–45 (3d Cir. 2013)) (internal quotations omitted).

[51] *Yogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (quoting *Mala*, 704 F.3d at 244).

[52] *Id.* (quoting *Mala*, 704 F.3d at 245) (italics added).

[53] Congress provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or other person . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

> 42 U.S.C. § 1983.

[54] *West v. Atkins*, 487 U.S. 42, 48 (1988).

[55] *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *Dooley*, 957 F.3d at 374 ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)); *see also Iqbal*, 556 U.S. at 676 (explaining that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must

plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution").

[56] ECF No. 1 ¶¶ 1–12.

[57] *McDuffie v. Varner*, No. 21-0161, 2021 WL 2206301, at *3 (E.D. Pa. June 1, 2021).

[58] *Locke v. Dep't of Corr.*, No. 21-1633, 2021 WL 5380987, at *3 (M.D. Pa. Nov. 17, 2021) (quoting *Lavia v. Pennsylvania Dep't of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000)).

[59] *Id.* (citing 42 Pa. Cons. Stat. § 8521(b)).

[60] *McDuffie*, 2021 WL 2206301, at *3.

[61] We construe Mr. Talbert's *pro se* complaint liberally as attempting to allege a *Monell* claim against Secretary Little and the supervisors for "fail[ing] to inform and train staff" and enforcing unconstitutional and unlawful policies and customs. ECF No. 1 ¶ 42. Mr. Talbert may bring a section 1983 claim against local government officials as "persons" within the meaning of 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). *Monell* liability arises where "there was a failure to train or institute appropriate policies and procedures, and that failure amounted to a 'deliberate indifference to the rights of persons with whom the [custodial official] c[a]me into contact.'" *Diorio v. Harry*, No. 21-1416, 2022 WL 3025479, at *7 (3d Cir. Aug. 1, 2022) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). But Mr. Talbert may only bring *Monell* claims against local government units and individuals of local government units. *Id.* When individuals are employees of the state, Mr. Talbert cannot bring *Monell* claims against them. *Id.* at *7. We dismiss Mr. Talbert's *Monell* claim against the Secretary Little and any of the Department of Corrections employees because they are employees of the Commonwealth.

[62] *Graves v. Gamble*, No. 21-344, 2023 WL 3741999, at *3 (W.D. Pa. Apr. 10, 2023), *report and recommendation adopte*d, No. 21-344, 2023 WL 3740783 (W.D. Pa. May 31, 2023) (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989)).

[63] *Id.* (quoting *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 506 (3d Cir. 2001)).

[64] *Id.* (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)).

[65] ECF No.  ¶¶ 63–66.

[66] *Id.* ¶¶ 63–64.

[67] *Id.* ¶ 66.

[68] *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

[69] *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); *see also Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *Coit v. Garman*, 812 F. App'x 83, 86 (3d Cir. 2020).

[70] *Mearin v. Vidonish*, 450 Fed. App'x 100, 102 (3d Cir. 2011).

[71] *Mack v. Warden Loretto FCI*, 839 F.3d 286, 298 (3d Cir. 2016).

[72] ECF No. 1 ¶ 13.

[73] *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (holding whether the incarcerated individual met the second element depends on "the facts of the particular case").

[74] *Newmones v. Ransom*, No. 21-00276, 2022 WL 4536296, at *5 (W.D. Pa. Sept. 28, 2022) (quoting *Allah*, 229 F.3d at 225)).

[75] *Id*. (internal citations omitted).

[76] *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000) (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).

[77] *Id.*

[78] *Jones v. Sorbu*, No. 20-5270, 2021 WL 398494, at *8 (E.D. Pa. Feb. 4, 2021).

[79] *McKinney v. Ryan*, No. 19-12302, 2022 WL 1308368, at *5 (D.N.J. May 2, 2022) (quoting *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016)).

[80] ECF No. 1 ¶ 13.

[81] *Id*. ¶ 14.

[82] *Newmones*, 2022 WL 4536296, at *3.

[83] *Id*.

[84] ECF No. ¶¶ 16–17.

[85] *Id.* ¶ 13.

[86] *Id*. ¶¶ 63–65.

[87] *Newmones*, 2022 WL 4536296, at *3.

[88] *Palmore v. Hornberger*, 813 F. App'x 68, 70 (3d Cir. 2020).

[89] *Id.*

[90] *Id.* at 71.

[91] ECF No. 1 ¶¶ 20, 24.

[92] *Id.* ¶ 23.

41

[93] *Id.* ¶ 13.

[94] *Id.* ¶ 28.

[95] *Id.* ¶¶ 29, 88.

[96] *Id.* ¶ 29.

[97] *Newmones*, 2022 WL 4536296, at *5.

[98] *Pepe v. Lamas*, 679 F. App'x 173, 175 (3d Cir. 2017).

[99] *Id.*

[100] *Id.*

[101] *Hammond v. City of Wilkes Barre*, 628 F. App'x 806, 808 (3d Cir. 2015) (citing *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002)).

[102] *Newmones*, 2022 WL 4536296, at *6.

[103] ECF No.  ¶ 34.

[104] *Id.*

[105] *Tabb v. Hannah*, No. 10-1122, 2012 WL 3113856, at *11 (M.D. Pa. July 30, 2012).

[106] *Newmones*, 2022 WL 4536296, at *3.

[107] ECF No. ¶¶ 36–37.

[108] *Id.* ¶ 37.

[109] *Id.* ¶ 13.

[110] *Newmones*, 2022 WL 4536296, at *5.

[111] ECF No. 1 ¶ 39.

[112] *Dooley v. Wetzel*, 957 F.3d at 374 (internal citations omitted).

[113] *Newmones*, 2022 WL 4536296, at *3.

[114] ECF No. 1 ¶¶ 82–84.

[115] *Id.* ¶ 83

[116] *Id.* ¶¶ 42, 84.

[117] *Nottingham v. Shapiro*, No. 21-396, 2021 WL 9166614, at *4 (M.D. Pa. Oct. 5, 2021), *report and recommendation adopted*, No. 21-396, 2021 WL 9166613 (M.D. Pa. Nov. 19, 2021), *aff'd sub nom. Nottingham v. Att'y Gen. Pennsylvania*, No. 21-3298, 2021 WL 9166614 (3d Cir. July 27, 2022).

[118] *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015).

[119] *Banegas v. Hampton*, No. 8-5348, 2009 WL 1098845, at *4 (E.D. Pa. Apr. 22, 2009) (citing *Rode*, 845 F.2d at 1207).

[120] *Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020).

[121] *Castillo v. All Jane/John Does of Deputized Postal Officers at All Facilities Plaintiff Was Incarcerated*, No. 15-00910, 2016 WL 6089853, at *9 (M.D. Pa. Sept. 20, 2016), *report and recommendation adopted*, No. 3:15-00910, 2016 WL 6090729 (M.D. Pa. Oct. 17, 2016) (internal citations omitted).

[122] *Id.* (quoting *Broadwater v. Fow*, 945 F. Supp. 2d 574, 588 (M.D. Pa. 2013)).

[123] *Id.*

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] *Banegas*, 2009 WL 1098845, at *6 (internal citations omitted).

[128] *Barkes*, 766 F.3d at 316.

[129] ECF No. 1 ¶¶ 82–83.

[130] *Mack v. Clark*, No. 21-00004, 2022 WL 2669510, at *5 (W.D. Pa. July 11, 2022) (quoting *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir. 1986); *Brown v. Grabowski*, 922 F.2d 1097, 1120 (3d Cir. 1990)) (cleaned up).

[131] *Washington v. Wolf*, No. 16-1714, 2017 WL 9487089, at *5 (W.D. Pa. Oct. 26, 2017), *report and recommendation adopted as modified*, No. 16-01714, 2017 WL 5589089 (W.D. Pa. Nov. 21, 2017).

[132] ECF No. 1 ¶¶ 78–79.

[133] *Jones v. Brown*, 461 F.3d 353, 358 (3d Cir. 2006) (quoting U.S. Const. amend. I).

[134] *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (internal citations omitted).

[135] *Id.* (internal citations omitted).

[136] *Id.* (internal citations omitted).

[137] *Id.* (internal citations omitted).

[138] *Castillo*, 2016 WL 6089853, at *4 (quoting *Jones*, 461 F.3d at 359).

[139] *Id.*

[140] *Id.*

[141] *Id.* at *5.

[142] *Id.*

[143] *Nixon v. Sec'y Pennsylvania Dep't of Corr.,* 501 F. App'x 176, 178 (3d Cir. 2012).

[144] *Id.*

[145] ECF No. 1 ¶¶ 78–79.

[146] *Id.* ¶ 79.

[147] *Id.* ¶ 36.

[148] *Castillo*, 2016 WL 6089853, at *5.

[149] ECF No. 1 ¶ 74.

[150] *Id.* ¶¶ 17–18, 24.

[151] *Id.*

[152] *Id.*

[153] *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). Mr. Talbert brings claims against Correctional Officers Casey and Beesley for "Excessive Use of Force" and as a "Cruel and Unusual Punishment Clause Violation." ECF No. 1 ¶¶ 67–69, 74–77. Because a claim for excessive force is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment, we will analyze this as one claim.

[154] *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson*, 503 U.S. at 4).

[155] *Id.* at 37–38 (quoting *Hudson*, 503 U.S. at 9).

[156] *Id.* at 38.

[157] *Id.*

[158] *Gibson v. Flemming*, 837 Fed. App'x 860, 862 (3d Cir. 2020) (quoting *Hudson*, 503 U.S. at 8).

44

[159] *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 303 (1991)) (internal quotations omitted).

[160] *Ricks v. Shover*, 891 F.3d 468, 480 (3d Cir. 2018).

[161] *Gibson*, 837 Fed. App'x at 862 (3d Cir. 2020) (internal citations omitted).

[162] *Drumgo v. Radcliff*, 661 Fed. App'x 758, 760 (3d Cir. 2016).

[163] *Id.* at 761 (citing *Jones v. Shields*, 207 F.3d 491, 495–97 (8th Cir. 2000)).

[164] ECF No. 1 ¶¶ 67–69.

[165] *Id.*

[166] *Id.* ¶¶ 17, 24.

[167] *Id.*

[168] *Id.* ¶ 34.

[169] *Id.* ¶ 76.

[170] *Tabb*, 2012 WL 3113856, at *11.

[171] *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 831–32 (1994)).

[172] *Id.* (internal citations omitted).

[173] *Woolfolk v. Meier*, No. 17-03513, 2018 WL 1773397, at *3 (E.D. Pa. Apr. 12, 2018).

[174] *Brown v. Deparlos*, 492 Fed. App'x 211, 215 (3d Cir. 2012).

[175] *Id.*

[176] *Woolfolk*, 2018 WL 1773397, at *3.

[177] *Id.* at *1.

[178] *Id.* at *3.

[179] *Id.*

[180] *Id.*

[181] ECF No. 1 ¶¶ 34, 76.

[182] *Id.*

[183] *Williams v. Thomas*, No. 12-01323, 2013 WL 1795578, at *7 (E.D. Pa. Apr. 29, 2013).

[184] ECF No. 1 ¶¶ 37, 74. Mr. Talbert also includes Correctional Officers Casey and Beesley in his food deprivation allegations at SCI Phoenix. But Correctional Officers Casey and Beesley are employees of SCI Coal Township, not SCI Phoenix, and could not have deprived him of food at SCI Phoenix. Mr. Talbert appears to have mistakenly included them in his claim.

[185] *Farmer*, 511 U.S. at 832 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).

[186] *Id.*

[187] *Id.* at 835.

[188] *Id.* at 834.

[189] *Rieco v. Moran*, 633 Fed. App'x 76, 78 (3d Cir. 2015).

[190] *Id.* (quoting *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983)).

[191] *Id.*

[192] *Id.*

[193] *Id.* (citing *Lindsey v. O'Connor*, 327 Fed. App'x. 319, 321 (3d Cir. 2009)).

[194] ECF No. 1 ¶ 37.

[195] *Id.* ¶ 75.

[196] *Dooley*, 957 F.3d at 374 (internal citations omitted).

[197] ECF No. 1 ¶ 75.

[198] *Id.* ¶ 88.

[199] *Id.* ¶ 29.

[200] *Id.* ¶¶ 30, 89.

[201] *Berry v. United States*, No. 22-6113, 2022 WL 17486238, at *3 (D.N.J. Dec. 7, 2022).

[202] *Id.*

[203] *Pew v. Wetzel*, No. 20-668, 2021 WL 6622085, at *8 (M.D. Pa. Oct. 15, 2021), *report and recommendation adopted*, No. 20-00668, 2022 WL 202953 (M.D. Pa. Jan. 21, 2022), *appeal dismissed*, No. 22-1250, 2022 WL 3339856 (3d Cir. June 16, 2022).

[204] *Berry*, 2022 WL 17486238, at *3. (quoting *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

[205] *Id.* at *4 (internal citation omitted).

46

[206] ECF No. 1 ¶¶ 87–91.

[207] *Id.* ¶ 89.

[208] *Id.* ¶ 30.

[209] *Id.* ¶ 72.

[210] *Id.* ¶¶ 72–73.

[211] U.S. Const. amend. XIV.

[212] *United States v. Salerno*, 481 U.S. 739, 746 (1987).

[213] *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 425 (3d Cir. 2006) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

[214] *Sherrill v. City of Hoboken*, No. 20-1251, 2021 WL 4473392, at *1 (3d Cir. Sept. 30, 2021) (citing *Schmidt v. Creedon*, 639 F.3d 587, 595 (3d Cir. 2011)).

[215] *Id.* ¶¶ 17, 24, 71–73.

[216] *Kaucher*, 455 F.3d at 425.

[217] *Passmore v. Ianello*, 528 Fed. App'x 144 (3rd Cir. 2013); *see also Newman v. Beard*, 617 F.3d 775 (3rd Cir. 2010).

[218] *Passmore,* 528 Fed. App'x at 149.

[219] *Id.*

[220] ECF No. 1 ¶¶ 16–17.

[221] *Id.* ¶ 20.

[222] *Id.* ¶¶ 22–24.

[223] *Id.*

[224] *Id.* ¶¶ 92–99.

[225] *Id.* ¶¶ 96–98.

[226] 42 U.S.C. § 12132.

[227] *Furgess v. Pennsylvania Dep't of Corr.*, 933 F. 3d 285, 289 (3rd Cir. 2019).

[228] *Haberle v. Troxell*, 885 F.3d 170, 180 (3d Cir. 2018) (internal citations omitted).

[229] *Moses v. Sorber*, No. 22-3385, 2023 WL 4552105, at *3 (E.D. Pa. July 14, 2023).

[230] ECF No. 1 ¶ 96.

[231] *Id.*

[232] *See Bernard v. Baldwin*, No. 20-5368, 2022 WL 847628, at *3 (N.D. Ill. Mar. 22, 2022) (allowing prisoner to sue the state correctional facility under the Americans with Disabilities Act where the prisoner alleged prison officers sprayed him with gas foam, oleoresin capsicum spray, and assaulted him); *Brady v. Fla. Dep't of Corr.*, No. 11-510, 2011 WL 5307856, at *2 (N.D. Fla. Nov. 1, 2011) (denying the Florida Department of Corrections motion to dismiss a prisoner's claim under the Americans with Disabilities Act where the prisoner's estate alleged the prison sprayed the prisoner with oleoresin capsicum spray although he had asthma, which caused his death).

[233] ECF No. 1 ¶ 45.

[234] *Id.* ¶ 96.

[235] *Id.* ¶¶ 58, 96.

[236] *Id.* ¶ 55.

[237] *Id.* ¶ 97.

[238] *Id.* ¶¶ 45, 97.

[239] *Id.* ¶¶ 23, 97.

[240] *Id.* ¶¶ 45, 97.

[241] *Id.* ¶ 98.

[242] *Id.*

[243] *Kokinda v. Pennsylvania Dep't of Corr.*, 663 F. App'x 156, 159 (3d Cir. 2016).

[244] *Pew v. Little*, No. 22-1488, 2023 WL 3455613, at *2 (E.D. Pa. May 12, 2023).

[245] ECF No. 1 ¶¶ 31–33.

[246] *Id.* ¶ 32.

[247] *Kokinda*, 663 F. Appx. at 159 (3d Cir. 2016) (internal quotations omitted).

[248] ECF No. 1 ¶ 70.

[249] *Moore v. Rosa*, No. 21-0933, 2021 WL 1143376, at *4 (E.D. Pa. Mar. 25, 2021).

[250] *Id.* (quoting *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994)).

[251] *Id.*

[252] *Id.*

[253] ECF No. 1 ¶¶ 60–61.

[254] *Id.* ¶ 60.

[255] *Frompovicz v. Hissner*, 434 F. Supp. 3d 269, 283 (E.D. Pa 2020) (citing *Rosembert v. Borough of E. Lansdowne*, 14 F. Supp. 3d 631, 647 (E.D. Pa. 2014) (quoting *Gale v. Storti*, 608 F. Supp. 2d 629, 635 (E.D. Pa. 2009)).

[256] *Savage v. Judge*, 644 F. Sup. 2d 550, 561 (E.D. Pa. 2009) (citing *Wilkins v. Bittenbender*, No. 4-2397, 2006 WL 860140, *18–19 (M.D. Pa. Mar. 31, 2006)).

[257] *Id.* (citing *Wilkins*, 2006 WL 860140, *18–19).

[258] *Langella v. Cercone*, No. 09-312, 2010 WL 2402971, at *4 (W.D. Pa. June 10, 2010) (quoting *Capogrosso v. The Supreme Court of N.J.,* 588 F.3d 180, 185 (3d Cir. 2009)).

[259] *Jutrowski v. Twp. of Riverdale,* 904 F.3d 280, 294 n.15 (3d Cir. 2018) (citing *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001) (quoting 42 U.S.C. § 1983)).

[260] *Blessing v. City of Latrobe*, No. 20-1212, 2022 WL 114077, at *9 (W.D. Pa. Jan. 12, 2022) (citing *Young v. Kann*, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991)).

[261] *Hammond v. Creative Fin. Plan. Org., Inc*., 800 F. Supp. 1244, 1250 (E.D. Pa. 1992).

[262] ECF No. 1 ¶ 60.

[263] *Kist v. Fatula*, No. 2006-67, 2007 WL 2404721, at *8 (W.D. Pa. Aug. 17, 2007).